COPY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JUDGE HOLWELL

|  |  |
|---|---|
| RICHARD A. CONNELL, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ZALE CORPORATION, RICHARD C. MARCUS, MARY L. FORTE, J. GLEN ADAMS, MARY E. BURTON, SUE E. GOVE, JOHN B. LOWE, JR., THOMAS C. SHULL, DAVID M. SZYMANSKI, MARK R. LENZ, THE ZALE PLAN COMMITTEE, and JOHN DOES 1-30,<br><br>Defendants. | CIVIL ACTION NO.:<br><br>**06 CV 5995**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYER RETIREMENT INCOME SECURITY ACT** |



RECEIVED
AUG 07 2006
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Richard A. Connell ("Plaintiff"), on behalf of himself and the Zale Corporation Savings and Investment Plan (the "Plan"), and a class of similarly situated participants and beneficiaries (the "Participants") of the Plan, by his attorneys, alleges the following for his Complaint (the "Complaint"):

## NATURE OF THE ACTION AND SUMMARY OF CLAIMS

1.     Plaintiff, Richard A. Connell, a participant in the Plan, brings this action against Zale Corporation ("Zale" or the "Company") and others for Plan-wide relief on behalf of the Plan, and on behalf of a class of Participants in the Plan for whose individual accounts the Plan held an interest in the common stock of Zale from August 30, 2005 to the present (the "Class Period").  Plaintiff brings this action on behalf of the Plan and the Participants pursuant to § 502(a)(2) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2)and (3).

2.     As more fully set forth below, Defendants breached their fiduciary duties owed to the Plan and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550.  As a result of these wrongful acts, pursuant

to ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are liable to make good to the Plan the losses resulting from each such breach of fiduciary duty.  Plaintiff also seeks equitable relief.

3.    Plaintiff alleges that it was imprudent for the Plan to invest in Zale common stock because the common stock was too risky for a retirement plan investment in that the price of common stock was artificially inflated.  Plaintiff also alleges that Defendants breached their fiduciary duties by negligently failing to disclose material information necessary for Participants to make informed decisions concerning the Plan's assets and benefits and investing in Zale common stock.

## JURISDICTION AND VENUE

4.    Plaintiff's claims arise under ERISA Section 502(e)(1), 29 U.S.C. § 1132(e)(1).

5.    This Court has jurisdiction over this action pursuant to ERISA Section 502(e)(l), 29 U.S.C. § 1132(e)(l).

6.    Venue is proper in this district pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is the district where some or all of the breaches took place, where one or more Defendants reside or may be found, and/or where the acts and transactions alleged herein. In addition, Zale maintains numerous stores within this District and transacts substantial business within this District. Zale common stock trades over the New York Stock Exchange ("NYSE"), located within this District.

7.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

### Plaintiff

8.      Plaintiff Richard A. Connell is a resident of the State of Pennsylvania.  At various times, Plaintiff's individual account in the Plan included Zale common stock as an investment option under the Plan.

### Defendants

9.      Defendant Zale is a Delaware corporation, headquartered at 901 Walnut Hill Lane, Irving, Texas.  Zale operates retail jewelry stores and has employees in all 50 states under the Zales, Gordon's, and Bailey Banks & Biddle names. The Company's stores are located primarily in shopping malls in the United States and Puerto Rico. Zales offers moderately priced jewelry, Gordon's offers merchandise at somewhat higher prices, and Bailey Banks & Biddle offers upscale jewelry. Zale is the Plan Administrator.

10.     Defendant Richard C. Marcus ("Marcus") has served as Chairman of the Board of Directors of the Company since August 1, 2004 and has also served as a Director of the Company since July 21, 1993.  Because of Defendant Marcus's position, he knew the adverse non-public information about the business of Zale, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Class Period, Defendant Marcus participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Upon information and belief, Defendant Marcus was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with

respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

11.     Defendant Mary L. Forte ("Forte") served as President, Chief Executive Officer and a Director of the Company.  Defendant Forte also served as Executive Vice President and Chief Merchandise Officer from February 2001 to July 2002.  From January 1998 to February 2001, she served as Executive Vice President and Chief Administrative Officer.  Defendant Forte joined the Company in July 1994 as the President of the Company's Gordon's Jewelers brand, and served in that position until January 1998.  On January 31, 2006, Defendant Forte resigned as President and Chief Executive Officer and as a director of the Company.  Because of Defendant Forte's position, she knew the adverse non-public information about the business of Zale, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Class Period, Defendant Forte participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Upon information and belief, Defendant Forte was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

12.     Defendant J. Glen Adams ("Adams") has served as a Director of the Company since July 21, 1993.  Because of Defendant Adams' position, he knew the adverse non-public information about the business of Zale, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other

information provided to him in connection therewith.  During the Class Period, Defendant Adams participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Upon information and belief, Defendant Adams was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

13.      Defendant Mary E. Burton ("Burton") has served as a director of the Company since August 1, 2003.  In connection with Ms. Forte's resignation, Defendant Burton has been appointed to serve as interim Chief Executive Officer, effective February 1, 2006.  Because of Defendant Burton's position, she knew the adverse non-public information about the business of Zale, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Class Period, Defendant Burton participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Upon information and belief, Defendant Burton was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

14.      Defendant Sue E. Gove ("Gove") served as a Director of the Company.  Defendant Gove also served as Chief Operating Officer.  Defendant Gove remained in the position of Chief Financial Officer until February 2003.  On March 23, 2006, Defendant Gove resigned as Executive Vice President and Chief Operating Officer and as a director of Zale Corporation.  Because of Defendant Gove's positions, she knew the adverse non-public information about the business of Zale, as well as

its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Class Period, Defendant Gove participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Upon information and belief, Defendant Gove was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

15.     Defendant John B. Lowe, Jr. ("Lowe") has served as a Director of the Company since March 5, 2004.  Because of Defendant Lowe's Board position, he knew the adverse non-public information about the business of Zale, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Class Period, Defendant Lowe participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Upon information and belief, Defendant Lowe was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

16.     Defendant Thomas C. Shull ("Shull") has served as a Director of the Company since August 26, 2004.  Because of Defendant Shull's Board position, he knew the adverse non-public information about the business of Zale, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other

corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Class Period, Defendant Shull participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Upon information and belief, Defendant Shull was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

17.     Defendant David M. Szymanski ("Szymanski") has served as a Director of the Company since January 15, 2004.  Upon information and belief, Defendant Symanski was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

18.     Defendant Mark R. Lenz ("Lenz") was the Group Senior Vice President and Chief Financial Officer of the Company.  On May 5, 2006, Defendant Lenz was placed on administrative leave.

19.     Defendants Marcus, Forte, Adams, Burton, Gove, Lowe, Shull, Szymanski, and Lenz are herein referred to as the "Individual Defendants."

20.     Defendant the Zale Plan Committee ("Plan Board") is comprised of Zale officers, directors and employees who participated in administering the Plan.

21.     The Zale Board of Directors had the fiduciary responsibility for decisions regarding the acquisition, holding, disposition and voting of Employer Stock in the Plan and had the exclusive power, authority and responsibility to determine whether to sell, purchase or hold Zale stock.

22.     Plaintiff is unaware of the true names and capacities of the remaining Defendants sued in this action by the fictitious names JOHN DOES 1 through 30.  At least some of those individuals are members of Zale's Plan Board, but Plaintiff has not yet been able to identify them.  Plaintiff will amend this Complaint when Plaintiff learns the names and capacities of those Defendants.  Plaintiff is informed and believes that each of the fictitiously named Defendants is in some manner responsible for the events that have damaged Plaintiff, the Plan and the Class.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action on his own behalf and, pursuant to Rules 23(a),(b)(l), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of all current and former participants in the Plan at any time from August 30, 2005 to the present.  Excluded from the Class are Defendants herein, officers and directors of Defendant Zale, members of the Individual Defendants' immediate families, and the heirs, successors or assigns of any of the foregoing.

24.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there were hundreds, if not thousands, of present and former employees of Zale who held shares of Zale common stock in their individual accounts under the Plan.

25.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether Defendants were fiduciaries;

(b)     Whether Defendants breached their fiduciary duties;

(c)     Whether the Plan and the Participants were injured by such breaches; and

        (d)     Whether the Class is entitled to certain benefits and injunctive relief.

26.     Plaintiff's claims are typical of the claims of the other members of the Class as Plaintiff and all members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

27.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained able counsel with experience in ERISA class action litigation. The interests of Plaintiff are coincident with and not antagonistic to the interests of the other Class members.

28.     Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants. In addition, adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

29.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## DESCRIPTION OF THE PLAN

30.     The Zale Corporation Savings and Investment Plan is an employee benefit plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

31.     The Plan was established by Zale explicitly to provide retirement benefits to its employees.

32.     The Form 11-K/A Annual Report filed with the Securities and Exchange Commission

("SEC") by the Plan on or about January 26, 2006, covering the Plan's fiscal year ended July 31, 2005,

states, among other things:.

>    *(a)  General*
>
>    According to Employees are eligible to participate in the Plan on the
>    first day of the month that coincides with or following the date on
>    which the employee has both i) completed one year of service and ii)
>    attained age 21. One year of service is defined by the Plan as a
>    12-month period commencing on the date of employment or
>    anniversary thereof during which the employee has completed 1,000 or
>    more hours of service with Zale Corporation or any of its related
>    affiliates (the Company or Employer). Employees covered under a
>    collective bargaining agreement, which does not provide for
>    participation in the Plan, and certain nonresident aliens are excluded
>    from participation. The Plan is subject to the provisions of the
>    Employee Retirement Income Security Act of 1974 (ERISA), as
>    amended.
>
>    *(b)  Employee Contributions*
>
>    Under the Plan, participants are permitted to voluntarily contribute, on
>    a pre-tax basis, from 1% to 30% of their annual earnings to their
>    respective Employee 401(k) Contribution Account. All participants are
>    subject to Internal Revenue Service (IRS) limitations on these
>    contributions. The maximum amount a participant could contribute
>    under this limitation is $14,000 and $13,000 for each calendar year 2005
>    and 2004, respectively. Effective August 1, 2002, employees who are or
>    will be at least 50 years of age by the end of a calendar year are eligible
>    to make additional pre-tax contributions called catch-up contributions
>    to the Plan at any time during such calendar year. The maximum
>    amount of catch-up contributions a participant can contribute is $4,000
>    and $3,000 for the calendar years 2005 and 2004, respectively.
>
>    *(c)  Employer Contributions*
>
>    The Plan provides that the Company make matching contributions
>    (Employer 401(k) Matching Contributions) to each eligible participant
>    who voluntarily contributes to the Plan.
>
>    To be eligible for an Employer 401(k) Matching Contribution, the Plan
>    requires that a participant be employed on the last day of the Plan year
>    (July 31) in order to receive an allocation of matching contributions,

Global Investment Option: Invests primarily in common stocks and other equity securities of companies based both within and outside of the United States.

Zale Corporation Common Stock: Participants may invest up to 25% of their past and future salary deferral contributions and employer matching contributions in Zale Corporation Common Stock. Employer matching contributions made in the form of Zale Corporation Common Stock are invested in such stock without regard to the 25% limit unless the participant directs otherwise in which case any subsequent participant investment of such contributions in Zale Corporation Common Stock is subject to the 25% limit. Employer matching contributions made in the form of cash are invested pursuant to the participant's direction, subject to the 25% limit on investments in Zale Corporation Common Stock.

## ADMINISTRATION OF THE PLAN

33.     At all times relevant to this Complaint, all Defendants were fiduciaries of the Plan as defined by ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control respecting management, disposition of assets and had discretionary authority or responsibility in the administration of the Plan.

34.     Zale is the Plan Administrator.

35.     Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA Section 405, 29 U.S.C. § 1105.

## FIDUCIARY DUTIES UNDER ERISA

36.     **The Statutory Requirements:** ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to

-12-

> minimize the risk of large losses, unless under the circumstances it is
> clearly prudent not to do so; and in accordance with the documents and
> instruments governing the plan insofar as such documents and
> instruments are consistent with the provisions of this title and Title IV.

37.     **The Duty of Loyalty:** ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ."

38.     The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

39.     **The Duty of Prudence:** Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence – that is, the duty "to discharge his [or her] duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

40.     **The Duty to Inform:** The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (i) a duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. These duties to disclose and inform recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

41.     Pursuant to the duty to inform, fiduciaries of the Plan were required under ERISA to furnish certain information to Participants. For example, ERISA § 101, 29 U.S.C. § 1021, requires that

fiduciaries furnish a summary plan description ("SPD") to Participants. ERISA § 102, 29 U.S.C. § 1022, provides that the SPD must apprise Participants of their rights under the plan.  The SPD and all information contained or incorporated therein constitutes a representation in a fiduciary capacity upon which Participants were entitled to rely in determining the identity and responsibilities of fiduciaries under the Plan and in making decisions concerning their benefits and investment and management of assets allocated to their accounts:

> The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b).

42.    **The Duty to Investigate and Monitor Investment Alternatives:**  With respect to a retirement plan such as the Plan, the duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plan, including employer securities, to ensure that each investment is a suitable option for the Plan.

43.    **The Duty to Monitor Appointed Fiduciaries**. Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus appointed.  The duty to monitor entails both giving information to and reviewing the actions of the appointed

fiduciaries.  In a retirement plan such as the Plan, the monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

        (a)      possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

        (b)      are knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

        (c)      are provided with adequate financial resources to do their jobs;

        (d)      have adequate information to do their jobs of overseeing the Plan investments with respect to all investment options, including company stock;

        (e)      have access to outside, impartial advisors when needed;

        (f)      maintain adequate records of the information on which they base their decisions and analysis with respect to Plan investment options; and

        (g)      report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

      44.      **The Duty Sometimes to Disregard Plan Documents**.  A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents.  While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

45.  **Co-Fiduciary Liability**. A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)  if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)  if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)  if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

46.  **Non-Fiduciary Liability**. Under ERISA, non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for a breach of fiduciary duty under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## PARTICIPANTS ARE NOT RESPONSIBLE FOR IMPRUDENT PLAN INVESTMENTS

47.  The fact that Participants selected investments from options pre-selected by Defendants is no defense in this case. Fiduciaries can shift liability for imprudent investments to Participants under ERISA § 404(c), 29 U.S.C. § 1104(c) only if, among other things, they meet five specific requirements:

> (a)  they disclose in advance the intent to shift liability to Participants;
>
> (b)  they designate the Plan as a "404(c) Plan" and adequately communicate this to Participants;
>
> (c)  they ensure that Participants are not subject to undue influence;

(d)     they provide an adequate description of the investment objectives and risk and return characteristics of each investment option; and

(e)     they disclose to Participants all material information necessary for Participants to make investment decisions that they are not precluded from disclosing under other applicable law.  In this regard, fiduciaries have a choice, they can disclose all material information to Participants, including information that they are not required to disclose under the securities laws, and shift liability to Participants, or they can comply with the more limited disclosure requirement under the securities laws but remain liable for imprudent investments.

29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(i) and (ii) and (c)(2)(i) and (ii).

48.     Defendants failed to shift liability to Participants for imprudent investment decisions under section 404(c) because they failed to comply with the relevant regulations, therefore this defense is not available to Defendants.

## IMPROPER STATEMENTS

49.     On August 30, 2005, the Company issued a press release announcing fourth quarter and full year financial results.  The Company reported net earnings of $4.1 million, or $0.08 per diluted share, for the Company's fourth quarter ended July 31, 2005 as compared to reported net earnings of $6.9 million, or $0.13 per diluted share for the Company's fourth quarter ended July 31, 2004.  Reported net earnings for fiscal year 2005 were $106.8 million, or $2.05 per diluted share as compared to net earnings of $106.5 million, or $1.99 per diluted share for the previous year.  The August 30, 2005 press release also stated that the Company would be closing certain Bailey Banks & Biddle stores, taking estimated charges to earnings of $13 million, net of tax, or $0.25 per diluted share, in fiscal 2006.

50.     In addition, the August 30, 2005 press release reported that the Company had "generated $89 million in free operating cash flow."  It defined "free operating cash flow" as "cash provided by operating activities (in accordance with GAAP) less net capital expenditures."

51.     On August 30, 2005, the Company also held an investor conference call during which Defendant Forte reported that the Company "generated 89 million in free operating cash flow." Free cash flow is often viewed as an appropriate indication of a Company's ability to repay maturing debt, change dividend payments or fund other uses of capital that management believes will enhance stockholder value.

52.     Defendants breached their fiduciary duty by causing the August 30, 2005 press release to be issued and the above specified representations to be made. In this regard, Defendants either knew or negligently failed to know that:

(a)     closure of the Bailey Banks & Biddle stores would

result in charges far more than $13 million, net of tax.

(b)     the Company had reported "cash provided by

operating activities" and "free operating cash flow" which were each overstated by approximately $8.2 million.

53.     On September 27, 2005, the Company filed a Form 8-K with the SEC which disclosed the Company's entry into new employment agreements with Defendants Forte and Gove. It presented the "material terms" of the Forte and Gove agreements, which stated the following with regard to termination of employment:

> Termination of Employment. The Company may terminate Ms. Forte's employment with the Company with or without Cause (as such term is defined in the Forte Agreement) and Ms. Forte may terminate her employment with the Company with or without Good Reason (as such term is defined in the Forte Agreement). If the Company terminates Ms. Forte's employment other than for Cause, death or disability *or Ms. Forte terminates her employment for Good Reason*: (i) the Company will pay Ms. Forte an amount equal to two times the sum of (v) her then current Base Salary and (w) the greater of her Target Bonus for the year of termination or the average of the immediately preceding two years' annual incentive bonuses; (ii) during the greater of (x) the 24-month period following termination or (y) the number of months,

-18-

including fractional months, remaining in the term, the Company will provide Ms. Forte (and, as applicable, her family) with executive perquisites and fringe and other benefits on a basis which is no less favorable than the basis on which such perquisites and benefits are provided to any other senior executive under any of the Company's plans; (iii) all unvested options and other equity and long-term incentive awards will immediately vest and continue to be exercisable for the remainder of their respective terms; (iv) Ms. Forte will receive an additional two years of service and age credit for purposes of determining the benefits payable to Ms. Forte under the Company's Supplemental Executive Retirement Plan; and (v) any accrued, but unpaid salary, bonuses, expenses or benefits as of the date of termination will be paid. Any termination payments made under the agreement are subject to the requirements of the American Jobs Creation Act of 2004 (the "AJCA").

\* \* \*

Termination of Employment. The Company may terminate Ms. Gove's employment with the Company with or without Cause (as such term is defined in the Gove Agreement) and Ms. Gove may terminate her employment with the Company with or without Good Reason (as such term is defined in the Gove Agreement). If the Company terminates Ms. Gove's employment other than for Cause, death or disability *or Ms. Gove terminates her employment for Good Reason*: (i) the Company will pay Ms. Gove an amount equal to two times the sum of (v) her then current Base Salary and (w) the greater of her Target Bonus for the year of termination or the average of the immediately preceding two years' annual incentive bonuses; (ii) during the greater of (x) the 24-month period following termination or (y) the number of months, including fractional months, remaining in the term, the Company will provide Ms. Gove (and, as applicable, her family) with executive perquisites and fringe and other benefits on a basis which is no less favorable than the basis on which such perquisites and benefits are provided to any other senior executive under any of the Company's plans; (iii) all unvested options and other equity and long-term incentive awards will immediately vest and continue to be exercisable for the remainder of their respective terms; (iv) Ms. Gove will receive an additional two years of service and age credit for purposes of determining the benefits payable to Ms. Gove under the Company's Supplemental Executive Retirement Plan; and (v) any accrued, but unpaid salary, bonuses, expenses or benefits as of the date of termination will be paid. Any termination payments made under the agreement are subject to the requirements of the AJCA.

(Emphasis added).

54.    On October 3, 2005, the Company filed its Form 10-K for the fiscal year ended July 31,

2005 with the SEC (the "Fiscal 2005 Form 10-K"). This document which was signed by Defendants

Forte, Lenz, and Gove stated:

> On August 30, 2005, the Company announced, as part of its strategy to improve brand performance and profitability, its intention to close approximately 30 Bailey Banks & Biddle stores after the upcoming Holiday season that do not fit with the brand's long term positioning in the luxury market. The closings are estimated to result in a charge of $13 million or $0.25 per share after taxes related to the leasehold improvements, inventory and lease exit costs.

55.    The Fiscal 2005 Form 10-K also contained Rule 13a-14(a) certifications signed by

Defendants Forte and Lenz which stated:

> 1.    I have reviewed this annual report on Form 10-K of Zale Corporation;
>
> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.    Based on my knowledge, the financial statements and other financial information included in this report fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by

others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

56. Defendants breached their fiduciary duty by causing the Fiscal 2005 Form 10-K to be filed with the SEC and the above representations to be made. In this regard, Defendants either knew

or negligently failed to know that the statement of cash flows contained therein improperly overstated reported "cash provided by operating activities" by approximately $8.2 million, and that closure of the Bailey Banks & Biddle stores would result in charges greatly exceeding $13 million, net of tax.

57.     In addition, Defendant Lenz breached his fiduciary duty by signing the above specified certification knowing that he had concealed from the Company's auditors the fact that he had delayed approximately $8.2 million in vendor payments that were to be made the last two weeks of the fiscal year ended July 2005 until the first week of August 2005. This caused the Company to improperly report an "increase net cash flows from operating activities and free operating cash flow" for the Company's fiscal fourth quarter and year ended July 2005 by approximately $8.2 million.

58.     On December 9, 2005, the Company filed its Form 10-Q for the quarterly period ended October 31, 2005 with the SEC (the "Fiscal 2006 First Quarter Form 10-Q"). This document which was signed by Defendant Lenz stated:

> Bailey Banks & Biddle. On August 30, 2005, the Company announced, as part of its strategy to improve brand performance and profitability, its intention to close approximately 30 Bailey Banks & Biddle stores after the upcoming holiday selling season that do not fit with the brand's long-term positioning in the luxury market. In the quarter ended October 31, 2005, *the Company recorded an impairment charge of $8.4 million before taxes related to these stores' leasehold improvements.* As part of the closing strategy, the Company has hired a national retail liquidation company to manage the liquidation process in the stores through the earlier of the stores' closing dates or January 31, 2006. *The closings are estimated to result in a charge totaling approximately $15.7 million or $0.30 per share after taxes.* This estimate includes assumptions for the leasehold improvements noted above, inventory and lease exit costs.

(Emphasis added).

59.     The Fiscal 2006 First Quarter Form 10-Q contained a Fiscal 2006 First Quarter statement of cash flows as well as a Rule 13a-14(a) certifications signed by Defendants Forte and Lenz which stated:

-22-

1.    I have reviewed this Quarterly Report on Form 10-Q of Zale Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)), and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

-23-

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

60.     Defendants breached their fiduciary duty by causing the Fiscal 2006 First Quarter Form 10-Q to be filed with the SEC and the above representations to be made. In this regard, Defendants either knew or negligently failed to know that closure of the Bailey Banks & Biddle stores would result in charges greatly exceeding $15.7 million or $0.30 per share after taxes.

61.     In addition, Defendant Lenz breached his fiduciary duty by signing the above specified certification knowing that he had concealed from the Company's auditors the fact that he had delayed approximately $8.2 million in vendor payments that were to be made the last two weeks of the fiscal year ended July 2005 until the first week of August 2005. This caused the Company's statements of cash flow to improperly report the Company's "net cash flows from operating activities" for the Company's fiscal 2005 fourth, fiscal 2005 year, and fiscal 2006 first quarter.

62.     On January 1, 2006, Zale filed with the SEC its Form 11-K for the Plan. The Form 11-K was signed by Cynthia T. Gordon – Senior Vice-President, Controller (principal accounting officer of the registrant). The Form 11-K contained descriptions of the Plan's operations. As such, the Form 11-K was a Fiduciary Communication.

63.     The Form 11-K was regularly updated by incorporating by reference, *inter alia*, the periodic financial results of Zale and the Plan contained in the Company's SEC filings, which Participants were able to, and were encouraged to, examine in determining investment options such as the Zale Stock Fund. These representations also constituted Fiduciary Communications.

64.     On January 19, 2006, *Defendant Gove sold 70,000 shares of the Company's stock obtaining proceeds of $1,773,611.*

65.     On January 20, 2006, *Defendant Gove sold 40,000 shares of the Company's stock obtaining proceeds of $999,704.*

66.     On January 30, 2006, the Company issued a press release announcing the resignation of Defendant Forte. The press release, which did not provide information sufficient to inform a reader whether or not Defendant Forte terminated her employment for "Good Reason" stated:

> DALLAS--(BUSINESS WIRE) – Jan. 30, 2006 – Zale Corporation (NYSE: ZLC) announced today that Mary L. Forte, President and Chief Executive Officer and member of the Board, has resigned from the Corporation. Effective immediately, the Board of Directors has appointed Board member Betsy Burton as Interim Chief Executive Officer until a successor is named.
>
> "The Company would like to thank Mary for her many contributions over the last 11 years and we wish her well in her future endeavors," commented Richard C. Marcus, Chairman of the Board of Directors. "We are very appreciative of the talent and energy she brought to the business."

67.     The January 30, 2006 press release did not disclose whether Defendant Forte terminated

her employment for "Good Reason" and, therefore, whether Defendant Forte was entitled to the

payments specified in paragraph 52 above.

68.     On March 10, 2006, the Company also filed its Form 10-Q for the quarterly period

ended January 31, 2006 with the SEC (the "Fiscal 2006 Second Quarter Form 10-Q"). This document

referred to an unexplained the $8.5 million charge for executive severance. It also stated the following

with regard to the closure of Bailey Banks and Biddle stores:

> The Company incurred a charge of $24.2 million, $0.31 per diluted
> share, for a write-down of inventory and lease settlement costs related
> to the closings for the three-month period ended January 31, 2006. The
> Company incurred a total of $32.6 million before taxes, $20.3 million or
> $0.40 per diluted share after taxes, related to the Bailey Banks and
> Biddle closings for the six month period ended January 31, 2006. These
> charges include $8.4 million in fixed asset impairments, in addition to
> the amounts for inventory and lease settlement. *The increase from
> previous estimates of $15-$16 million after taxes, or $0.30-$0.32 per
> diluted share relates primarily to higher lease settlement expenses
> than originally estimated.*

(Emphasis added).

69.     The Fiscal 2006 Second Quarter Form 10-Q also contained a Rule 13a-14(a) certification

signed by Defendants Lenz and Burton which stated:

> 1.    I have reviewed this Quarterly Report on Form 10-Q of Zale
>        Corporation;
>
> 2.    Based on my knowledge, this report does not contain any
>        untrue statement of a material fact or omit to state a material
>        fact necessary to make the statements made, in light of the
>        circumstances under which such statements were made, not
>        misleading with respect to the period covered by this report;
>
> 3.    Based on my knowledge, the financial statements, and other
>        financial information included in this report, fairly present in all
>        material respects the financial condition, results of operations
>        and cash flows of the registrant as of, and for, the periods
>        presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)), and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect

the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

70.    Defendants breached their fiduciary duty by causing the Fiscal 2006 second quarter Form 10-Q to be filed with the SEC and the above representations to be made. In this regard, Defendants either knew or negligently failed to know that closure of the Bailey Banks & Biddle stores would result in charges greatly exceeding $15.7 million or $0.30 per share after taxes.

71.    In addition, Defendants Lenz and Burton breached their fiduciary duty by signing the above specified certification knowing that they had concealed from the Company's auditors the fact that they had delayed approximately $8.2 million in vendor payments that were to be made the last two weeks of the fiscal year ended July 2005 until the first week of August 2005. This caused the Company to improperly report the Company's "net cash flows from operating activities" for the Company's six months ended January 31, 2006 as well as the Company's fiscal 2005 fourth quarter and full year, and its fiscal 2006 first quarter.

72.    On March 23, 2006, the Company issued a press release announcing the resignation of Defendant Gove. The press release, which did not provide information sufficient to inform a reader whether or not Defendant Gove terminated her employment for "Good Reason" and, therefore, whether Defendant Gove was entitled to the payments specified in paragraph 52 above, stated:

**Zale Corporation Announces Resignation of Executive Vice President and Chief Operating Officer Sue E. Gove**

DALLAS – (BUSINESS WIRE) – March 23, 2006 – Zale Corporation (NYSE: ZLC) announced today that Sue E. Gove, Executive Vice President and Chief Operating Officer and member of the Board of Directors, has resigned as an officer and director of the Company effective immediately.

-28-

"The Company would like to thank Sue for her many contributions over the last 25 years and we wish her well in her future endeavors," commented Richard C. Marcus, Chairman of the Board of Directors. "We are very appreciative of the talent, dedication, and passion she brought to the business."

73.    Certain of the foregoing breaches of fiduciary duty became known on April 10, 2006,

when the Company issued a press release announcing that:

### Zale Corporation Announces SEC Investigation

DALLAS – (BUSINESS WIRE) – April 10, 2006 – Zale Corporation (NYSE: ZLC) announced today that the *Securities and Exchange Commission has initiated a non-public investigation relating to various accounting and other matters related to the Company, including accounting for extended service agreements, leases, and accrued payroll.* Subpoenas issued in connection with the investigation request materials relating to these accounting matters as well as to executive compensation and severance, earnings guidance, stock trading, and the timing of certain vendor payments.

(Emphasis added).

74.    The April 10, 2006 disclosure sent the price of the Company's stock into a tailspin. The

stock closed at 25.16 in unusually heavy trading, as compared to a closing price of 27.80 on the previous

day of trading.

75.    On May 5, 2006, after the market closed, the Company issued a press release which

admitted that Defendant Lenz improperly caused the Company to "increase net cash flows from

operating activities and free operating cash flow" for the Company's fiscal fourth quarter and year ended

July 2005 by approximately $8.2 million. The press release stated:

### Zale Corporation Announces Change in Chief Financial Officer

DALLAS, May 05, 2006 (BUSINESS WIRE) -- Zale Corporation (NYSE: ZLC) today announced that Mark Lenz, Group Senior Vice President and Chief Financial Officer, has been placed on administrative leave until further notice.

-29-

This decision was made after recent discussions with the Company's outside auditors concerning Mr. Lenz's failure to timely disclose in conversations with the auditors that vendor payments scheduled to be made during the last two weeks of the Company's fiscal year ended July 2005 were delayed until the first week of August 2005. The delay of the scheduled payments in July did not affect reported revenues or earnings, but did increase net cash flows from operating activities and free operating cash flow. The Company believes that both cash and accounts payable were properly reflected on the balance sheet. The Company is determining the exact amount of the deferred payments, but currently believes it did not exceed $8.2 million. For the fiscal year ended July 31, 2005, the Company reported net cash flows from operating activities of $168 million and disclosed free operating cash flow, a non-GAAP financial measurement, of $89 million. The Company has discussed this matter with the Securities and Exchange Commission and is reviewing the matter internally and with its auditors.

76.    As reported in a May 6, 2006 (Saturday) article in *The Dallas Morning News*, Zale announced on Friday May 5, 2006 (after the market closed) that chief financial officer Mark Lenz has been placed on administrative leave after the Company's outside auditor found that he failed to make timely disclosure that vendor payments were delayed in 2005. According to the article:

The troubled Irving-based jeweler said in April that its accounting practices were under investigation by the Securities and Exchange Commission and that timing of vendor payments was one of the topics to be covered.

That disclosure followed the recent departure of three top executives. Chief executive Mary Forte was asked to resign Jan. 30, and chief operating officer Sue Gove left in March. Paul Leonard, president of the company's largest division, Zales, was asked to resign in February.

The decision to put Mr. Lenz on administrative leave until further notice was made after auditors from KPMG made the discovery, the company said in a statement.

About $8.2 million in vendor payments that were to be made the last two weeks of the fiscal year ended July 2005 were delayed until the first week of August 2005, Zale said.

77.    After issuance of the May 5, 2006 press release, the price of the Company's stock continued to decline.

-30-

78.     On May 17, 2006, *The Dallas Morning News*, reported that the SEC probe leaves a looming uncertainty over the company.

Zale has already said that, based on SEC subpoenas, it believes the agency is investigating "executive compensation and severance, earnings guidance, stock trading." The article noted that "***Ms. Forte and Ms. Gove negotiated new one-year contracts in late September, giving them raises and higher bonuses and separation terms***" and stated that "the SEC could be looking at Ms. Gove's sales on Jan. 19 and 20, just days before Ms. Forte's firing was made public."

79.     On May 17, 2006, the Company held an investor conference call during which Defendant Burton stated:

> I would like to start by speaking to the various management changes since our last conference call as well as the notification of an SEC investigation. First, with the departure of Sue Gove our Chief Operating Officer and now most recently Mark Lenz our Chief Financial Officer who was placed on administrative leave. Mark's leave was the result of failure to timely disclose in conversations with the auditors the delaying of merchandise vendor payments for two weeks at the end of fiscal year ending July 31, 2005. As we stated in the release, the issue of delaying approximately 8 million in merchandise vendor payments does not involve revenues or earnings, and the Company believes that the fiscal year end balance sheet accurately reflects cash and payables. With regard to the SEC investigation, we have had discussions with the SEC staff and are cooperating fully. We are reviewing the items they raised, which relate to the areas of extended service agreements, leases, accrued payroll, and the timing of certain vendor payments.

80.     As particularized above, Defendants breached their fiduciary duty by:

    (a)     providing Defendants Gove and Forte with gifts, in

the form of hefty severance packages;

    (b)     providing false estimates of future store closure

-31-

costs (false forward looking financial information), when the factors entering into these closure costs (lease termination costs, and impairments to leasehold improvements and inventory) was either known or reasonably estimable;

        (c)      trading on inside information;

        (d)      falsely manipulating the Company's reported cash

provided by operating activities, and free operating cash flow; and

        (e)      issuing false and misleading Rule 13a-14(a)

certifications.

## DEFENDANTS ARE LIABLE FOR ALL IMPRUDENT INVESTMENTS

81.      Defendants are liable for imprudent investments made by the Plan, even though the Participants directed their individual contributions to the Plan, because the Plan and the Defendants did not shift liability for imprudent investments by the Plan to Participants under ERISA § 404(c), 29 U.S.C. § 1104(c). Thus, Defendants' liability for losses is the same as the liability of a pension fund manager in a traditionally defined benefit "pension" plan.

82.      Although fiduciaries can shift liability for imprudent investments from themselves to Participants under § 404(c), Defendants failed to shift liability to Participants for imprudent investment decisions because they failed to comply with Section § 404(c) for various reasons, including: (i) they failed to adequately declare that the Plan was a 404(c) plan; (ii) Defendants negligently failed to disclose to Participants all material information necessary for Participants to make investment decisions that they were not precluded from disclosing under applicable law; and (iii) Defendants failed to provide an adequate description of the investment objectives and risk and return characteristics of the Plan.

83.     Because Defendants did not comply with § 404(c), Defendants are liable for losses suffered as a result of the Plan's imprudent investments, regardless of whether Participants selected the investments made by the Plan for Participants' individual accounts.

84.     Further, the act of designating investment alternatives is a fiduciary function regardless of a Plan's purported status as an ERISA § 404(c) status. The responsible Plan fiduciaries are subject to ERISA's general fiduciary standards in initially choosing and/or continuing to designate investment alternatives offered by the Plan.

85.     As Zale stock lost a significant amount of its value, the Plan suffered devastating losses. Hundreds or thousands of Participants lost a substantial portion of their retirement savings. Defendants are liable for those losses which were caused by their breaches of fiduciary duty.

## COUNT I

### Defendants Breached Their Fiduciary Duties By Designating Zale Stock As An Investment Option And Permitting The Plan To Invest In Zale Stock

86.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

87.     Defendants breached their fiduciary duties by allowing the Plan to purchase and hold Zale shares during the Class Period and by allowing the Zale shares to remain as investment options under the Plan, because Zale stock was an imprudent investment for the Plan and the purpose of the Plan was to provide for employee retirement income security.

88.     As a result, Defendants should have terminated Zale stock as an investment option, halted the purchase of Zale shares and sold all their shares in Zale stock.

89.     To the contrary, Defendants failed to act in the best interest of the Plan and the Class members.

-33-

90.     To the extent that Defendants possessed material adverse nonpublic information, they should have prevented the Plan from purchasing additional Zale shares. They also should have directed the Plan to sell all of its Zale shares and disclosed this nonpublic information prior to any sales by the Plan. Had they done so, the Plan would have limited its losses substantially, even though the price might have dropped somewhat upon disclosure.

91.     Defendants were fiduciaries who breached their fiduciary duties in that they should have known the facts as alleged above and should have know that the Plan should not have invested such large amounts in Zale stock.

92.     Defendants are liable to personally make good to the Plan any losses to the Plan resulting from each breach under ERISA § 502(a)(2).

93.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief to the Class.

## COUNT II

### Failure To Prudently And Loyally Manage the Assets Of The Plan – Breaches Of Fiduciary Duties In Violation Of ERISA § 404 - All Defendants

94.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

95.     At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

96.     Defendants were responsible for selecting, maintaining and monitoring the Plan's investment options, including the option to purchase and to hold Zale securities.

97.     Defendants exercised discretionary authority and/or control over managing the Plan or disposing of the Plan's assets and were, during the Class Period, responsible for ensuring that

-34-

investment options made available to participants in the Plan were prudent. Defendants were responsible for ensuring that all investments in Zale securities in the Plan were prudent and, as a result, Defendants are liable for losses incurred as a result of such investments being imprudent.

98.     In direct violation of their duty of loyalty to the Plan and its members, Defendants failed to diverge from the Plan documents and/or directives that they reasonably should have known would lead to an imprudent result or would otherwise harm Plaintiff and members of the Class. Defendants, either themselves or through persons they direct or control, improperly followed Plan documents and directives, leading to an imprudent result that harmed the Plan's Participants.

99.     Defendants breached their duties to prudently and loyally manage the assets of the Plan. During the Class Period, upon the exercise of reasonable care, Defendants should reasonably have known that investment in Zale securities was imprudent in that any such investment was unsuitable and inappropriate for either Participants or Company contributions to the Plan. During the Class Period, Defendants, in violation of their fiduciary duties, continued to offer and require Zale securities as an investment requirement for the Plan and to direct and approve Plan investment in Zale securities, instead of other investments. Despite the imprudence of any investment in Zale securities during the Class Period, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan's Participants, from suffering losses as a result of the Plan's investment in Zale securities.

100.    Defendants also breached their duty of loyalty by failing to administer the Plan with single-minded devotion to the interests of Plaintiff and members of the Class, regardless of Defendants' own interests.

101.    Defendants also breached their fiduciary duties by failing to disclose that they had failed to prudently and loyally manage the assets of the Plan in the exercise of their discretion with respect to the Zale securities.

102.    As a direct and proximate result of Defendants' breaches of their fiduciary duties to Plaintiff and the Class, the Plan, and indirectly Plaintiff and the members of the Class, suffered for which Defendants are liable.

### COUNT III

#### Failure To Monitor The Plan And Provide Accurate Information - Breaches Of Fiduciary Duties In Violation Of ERISA § 404

103.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

104.    During the Class Period, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

105.    The duty of the fiduciary includes at least:

(a)    a duty not to misinform;

(b)    a duty to inform when the fiduciary knows or should know that silence might be harmful; and

(c)    a duty to convey complete and accurate information material to participants and beneficiaries.

106.    Defendants negligently misrepresented to Participants the riskiness of their investments in Zale stock by failing to provide an adequate description of the investment objectives and risk and return characteristics of Zale stock. Defendants failed to disclose that the performance and value of Zale stock in Participants' accounts were substantially affected by the facts and risks alleged above.

107.    Defendants breached their fiduciary duties in that they negligently made material misrepresentations and negligently failed to disclose material information to Participants concerning the Plan's investment options as alleged above.

108.    In breach of their fiduciary duties, Defendants also made negligent misrepresentations and negligently failed to disclose material information to Participants.

109.    Defendants should have known that their negligent misstatements and nondisclosures alleged above would artificially inflate the market price of Zale securities, and that the price the Plan paid for Zale shares would likewise be inflated.  As a result of these negligent misrepresentations and nondisclosures, the Plan's purchases of Zale stock were imprudent because the shares cost more than their true value.

110.    Moreover, Defendants should have known that when the market learned the truth about Zale's problems, the market price of Zale securities - and the value of the Plan - would drop which would further cause the investments in Zale stock to be imprudent.

111.    The Plan and the Participants relied upon, and are presumed to have relied upon, Defendants' representations and nondisclosures to their detriment.

112.    As a consequence of Defendants' misrepresentations and nondisclosures, the Plan suffered losses.

113.    Defendants are personally liable to make good to the Plan any losses to the Plan resulting from each breach.

114.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief.

## COUNT IV

### Failure To Monitor The Plan And Provide The
### Administrators Of The Plan And Other Fiduciaries
### With Accurate Information - Breaches Of
### Fiduciary Duties In Violation Of ERISA § 404

115.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

116.   During the Class Period, Defendants were fiduciaries within the meaning of ERISA §
3(21)(A), 29 U.S.C. § 1002(21)(A).

117.   By virtue of their fiduciary responsibilities, Defendants also were bound to monitor
other fiduciaries and to provide them with information sufficient to perform their duties overseeing the
Plan and its investments.

118.   Defendants breached their duties to monitor and inform by:

(a)   Failing to ensure that the monitored fiduciaries had access to knowledge about
Zale's risk associated with its financials, as alleged above, which made the Zale securities an imprudent
investment;

(b)   Failing to ensure that the monitored fiduciaries appreciated the increased risk
posed by the significant investment by rank and file employees in the Zale securities; and

(c)   Failing to disclose to the monitored fiduciaries accurate information about the
operations of and risks to Zale that Defendants reasonably should have known the monitored
fiduciaries needed to have in order to make sufficiently informed decisions about what investment
options the Plan should offer.

119.   Defendants are liable as co-fiduciaries because:

(a)   They participated in the fiduciary breaches by their fellow Defendant-fiduciaries
in the activities described in this Complaint;

(b)   They enabled the breaches by these Defendants; and

(c)   They reasonably should have known of these breaches yet made not effort to
remedy them.

120.   As a direct and proximate result of the breaches of fiduciary duty alleged herein, the
Plan, and indirectly Plaintiff and the members of the Class, suffered for which Defendants are liable.